Good morning, your honors. May it please the court. Dennis Fan on behalf of the United States. With the court's permission, I'd like to reserve five minutes for rebuttal. In this case, Rico met Fajardo during another agent's passport investigation where he was brought along to assist because of his Spanish-speaking ability. Then days later, after receiving a voicemail, he turned to his conceitedly personal objectives in texting and visiting her. California law controls here, and California courts have found in directly analogous situations that there is no vicarious liability in that type of situation, as the California Court of Appeal in ZV most recently decided. If we only were dealing with California decisions, I think you'd have a much easier time. So what do you do with, however I pronounce it, Zhu? For the purpose of argument, I'll call it Lu, which might make it a little bit easier. But Lu is this Ninth Circuit's, this court's decision. Of course, Lu did not decide that this court couldn't rely on subsequent decisions of the California Court of Appeals that were directly analogous to the situation. And I just want to point out how close the facts of ZV are to this precise case. And then I'm happy also to go and discuss why Lu is on its face distinguishable and also why even taking the framework in Lu, why I think we still prevail in this case. Well, let me ask the question differently. Should we certify this question to the California Supreme Court? We wouldn't object. I mean, there's various things this Court of Appeals can, I mean, the Ninth Circuit can do to certify. They can certify the underlying scope question. But usually certification is reserved when there's a kind of question of law that's at issue. And here this is more a question of whether there is a factually on-point California decision. And I think in ZV there is. And in ZV, what you had there was, like here, a social worker who was not directly assigned to the case at hand. That social worker brought a minor to a foster home. That was the end of their duties. Later that night, the social worker called under the guise of picking up some paperwork. And the minor expressed some dissatisfaction with the new foster home. The social worker then went to the foster home, picked the minor up, and then committed sexual assault. Now, the California Court of Appeal in ZV stated that that's not in the scope of employment. Isn't the facts here slightly different, or obviously different, in the sense that Ms. Fajardo contacted Mr. Rico and said, I have some information for you. And then whether he went on a frolic or detour after that phone call is a separate issue. But the fact that she contacted him and asked him to perform duties related to his job distinguished the case? I don't think it distinguishes at all. In ZV, what happened was he called to pick up paperwork, but the minor requested then to talk to him. So if you look on page 892 to 893 of ZV are the facts of that case. And in that case, the minor said, well, I want to talk to you because I'm dissatisfied. And so that was the communication. It was, in essence, initiated by the minor. So I don't think that's a material distinction in any event. And as Your Honor pointed out, the fact that after doing that, you turned to conceitedly personal purposes, as Rico here has, through admissions to the State Department, conceited and admitted that this was for only personal reasons. But I want to get back to Lew, to use that pronunciation. In that case, didn't the State Department representative, wasn't he acting on purely personal motives when the assault occurred? I would actually point you to the facts of Lew, which are on page 946 of the reporter, in that opinion. And there's kind of two factual ways I think Lew is very distinguishable from this case. Lew, first of all, involved an instance where the employee, the asylum officer, had control of this entire process. There was no question that he was authorized to engage in this sort of. That's not the thing I was asking you to focus on. You said, well, by the time Mr. Rico went to see Ms. Fajardo, he was on the frolic and detour, if I can describe it as that. He wasn't doing his job. He was on a personal mission. Wasn't that true of Mr. Powell also by the time he went to see the plaintiff in that case? And so not only was there this authority, this court in Lew did say on page 946 that the second meeting when the asylum officer went back to the home of Lew and back to the second plaintiff in Lew as well, how that involved discussing her case and it regarded the details of the application in each of those cases. So the idea in Lew was that the asylum officer in those cases was still acting, even in some kind of perverse way, in engaging with the asylum applicant. The asylum officer in that case said, well, if you do certain things, if you give me money, if you exchange in sexual favors, I might grant or I might deny your asylum application. That is still engaging with the asylum process, whereas here there's nothing that Rico was doing that was engaging in one of his actual duties. And California courts have made clear that you can't simply- He was on duty. I mean, he wasn't supposed to go to the house by himself, but he was on duty, and he was investigating a fraud, a passport fraud, as is his job and duties and responsibilities as a special agent with the Department of State. We actually disagree with that characterization. He was not investigating passport fraud during the course of the Fajardo investigation. So this record here is- What do you mean he wasn't? I mean, why did he show up in the first place? Well, he makes it pretty clear why he showed up in the first place. He concedes the State Department investigators on pages 73 and 76 of the record that this was for purely personal reasons. They had no official business in doing this. No, but originally- Oh, sorry. Yeah, the original. He was acting as a law enforcement, I think, officer, a special agent. How do you characterize that? That's entirely correct. I mean, there was a first meeting of this case, as you recall, and then several days later is when he- He texts him at some point and says, I have additional information regarding this. There's a lot of other information, apparently, that's being texted. But I have additional information regarding this case and this crime. And he says, okay, I'll come by and get whatever information. I think it was a take-I don't know if it was take an additional statement or she said she had something she wanted- Yeah, actually, those words are never used. So if you look at page 92 is when the text messages begin on page 117 of the record is when the actual encounter is transcribed. This is a fairly robust record in a case like this where almost everything is kind of encapsulated into transcriptions. So what's the first communication from her to him that gives rise to this meeting? Yeah, we're not sure. It's not- Well, on this record, we are- On this record- We have him saying, she told me, she called me to say that she had important- She had information regarding the investigation. That's what I'm trying to- What you just said previously in that statement seems very different. And if, in fact, he was engaged in some type of passport interview, this would be an entirely different case. But if you actually look at the record- Well, he says he was, though. He says that's why he responded to her call and that's why he went to her house. He may have decided on the way that rather than doing a passport interview- And, of course, this is all denied whether an assault occurred. But for purposes of this, we assume that it did. Do you- I guess, do you think he was a law enforcement officer? I mean, was he a special agent with the Department of State, you know, whose job entailed conducting criminal investigations? So would he fall under the Mary M exception regarding a police officer? I mean, certainly he wouldn't fall within the Mary M exception for, you know, a couple of reasons. One, in the sort of FTCA Westfall Act context, under the Statute 2674, you look at what a private party- what the liability for private parties would be. And so this court in lieu rejected that you would be looking to Mary M in similar cases. And it squarely rejected that in its discussion. But it seems like you agree that with the Ninth Circuit regarding that, or Powell decision or the Liu decision, that we can't look at any California cases involving public employees. But you also cite two public employee cases in your brief. So may we look at public employee cases in your view? Seems like you're arguing both sides of that. Yeah, so I don't mean to be confusing about this. California courts have generally the same vicarious liability law it seems for private and public entities. They've carved out an exception for that general rule in this unique context of police officers. So if you look at footnote 11 of the Lisa M decision, they say in the unique context of police officers, this is what happens. So we are drawing analogies because this is an FTCA context to the liability of private parties. And I do want to turn to Liu. Now that you bring it up and to more directly answer Judge Hurwitz's first question regarding Liu, even taking Liu at face value, if you look on page 949- We have to take it at face value. Of course, you have to take it. Well, right. Well, even taking Liu at face value, if you look at page 949, they say Lisa M draws a helpful line. And the helpful line that Lisa M draws- That's where it says what? Liu says that Lisa M draws a helpful line. And the helpful line is that the employee there had completed the responsibilities. The hospital technician and Lisa M had completed the responsibilities and then returned to engage in conduct that they weren't actually authorized to do. Let's talk about that because I think it's Lisa M that discusses foreseeability, right? And that we should be guided by some policy principles, preventing future injuries, assuring compensation with victims and spreading the losses caused by any enterprise equitably. And it looks like California instructs us to look at the three policy rationales in deciding whether the employee should be liable. So doesn't holding the government accountable for RICO's tort here advance those policy principles? I mean, for example, that holding the United States accountable encourages the government to deter the behavior? So the three policy principles are deterrence, spreading the loss. And at least in Lisa M and John R, which is another California Supreme Court case that proceeded that, they thought that, you know, the idea of spreading the loss wasn't actually directly applicable in these sort of circumstances. And those policy principles certainly guide the analysis. But if you look in Lisa M preceding that, you have essentially what is the legal standard, which is that this has to personal conduct that substantially deviates from your actual employment responsibilities has to be. What do we do about the fact, though, that all these California cases that you're pointing to, I don't know that I necessarily disagree or I'm not sure about the California law, but all these California cases were decided before Lew was. So not all of them were. I mean, ZV was decided after Lew was decided in 2000. The main ones are the ones that I would consider, you know, your primary authority were decided before. We issued a decision in Lew. Judge Bybee issued a very clear dissent. And it did not go en banc, did not get changed in any way. And I'm just trying to figure out how do we, in the face of the current posture, not follow Lew? So I think there's three ways, again, to kind of distinguish. First of all, this is a factually distinct situation than what we had in Lew, where Lew, the asylum officer. And then if you think that this is exactly the same factual situation as Lew, certainly Lew did not foreclose or reliance on subsequent California court of appeals cases that are even more analogous to the situation here. The Supreme Court hasn't weighed in. The California Supreme Court has not had another one of these sexual harassment or sexual assault cases. And the last point I do want to make is at least this court in In re Watts has said that if there are intermediate state court decisions that contradict decisions of this court, unless there is a good reason to believe that the California Supreme Court wouldn't adopt those positions, such as in ZV, then we should be following what essentially is the best exposition of California law, and that is the decision in ZV. That is the most recent. It's the most directly analogous. And all this court has to do is to essentially look at ZV, say this is precisely the situation there. There's a pretense of going to somebody's house to engage in an interview. But if you look at the record, there is no interview. It doesn't exist. Just one other question before your time runs out. But all the cases you refer to are that you claim are applicable here are the sexual assault types of cases. But it looks like at least one of the plaintiffs, the daughter here, is bringing an emotional distress claim. Does that change our analysis? Yeah, we don't we don't think that actually changes the scope of employment. I mean, the scope of employment is sort of an antecedent question of was the employee acting as part of the employer's business at the time? And so it's an all or nothing inquiry. And then you go into the individual claims against the employee. Once you say he's within scope, what kind of claims can I bring? And here, again, it's sort of conceitedly personal purposes. So I'd like to preserve the remainder of my very little time remaining for rebuttal. Thank you. Thank you. Good morning, Your Honors. May it please the court. My name is Daniel Crowley for the appellee, Marco Rico. I want to start by as I was preparing for today's argument. I began to realize that in a really important respect, I think the parties have missed the point in one respect. We've sort of gotten lost in this public-private dichotomy. But that actually has no application to this case. And it's clear from the text of the statute why. There's the plaintiff's claims arise under the Federal Torts Claims Act. But this case involves the Westfall Act, which amended the FTCA to provide immunity for certain employees. The FTCA, of course, came first, and it provides that the government is liable for any act or omission of any employee of the government while acting within the scope of his office or employment under the circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. And I know that's a mouthful, but it's that if a private person would be liable language, that's what the courts have held requires a reference to a private person analog. But the Westfall Act, which came later, doesn't include similar language. The Westfall Act says that if the employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, and then skipping ahead, the United States shall be substituted as the party defendant. The Westfall Act makes no limitation for a private person analog, and there's nothing in the text of the statute that suggests that it should be interpreted that way. All of the cases at the parties' site that discuss the private person analog are all FTCA cases. They're all cases that are deciding the ultimate question of whether the government is liable for the plaintiff's claims. The Westfall Act case is at the parties' site, and there aren't many because you're really just adopting another jurisdiction's substantive law when you apply it. But the cases are Osborne and Kent and McLaughlin. So under the Westfall Act, we still apply California law to determine? Absolutely. But there's no limitation on whether it's a public or private law that's being applied. I don't know if you did that. Did you discuss that in your brief? No, we did not. Okay. It just occurred to you? It's something that we realized in going over this again, preparing for this. All right. I wish it came out differently, but this is the way it is. So the question then for the court is just whether or not applying California law, Agent Rico was acting within the scope of his duties as a law enforcement officer. Well, although the California law as I read it, which isn't all that favorable to you, Lou may be more favorable to you than the California decisions, doesn't distinguish between public and private employees in the course of the scope analysis, except for police officers in that sort of situation where they're detaining someone. So does it make any difference? Well, I mean, we argued in our brief that even if there was this dichotomy, you could still look to the public employment cases. So my question is, does it make a difference? So in that sense, I don't think it makes a difference. Okay. But to the extent that the government tries to distinguish those cases because they were public employees, I don't think that's fair. So you argue here, it seems like, I'm going to just go back to what I saw in your briefing here, you argue that the alleged sexual assault here was foreseeable consequence of Mr. Rico's employment. And I'm just trying to figure out under the California law of Lisa M., there seems to be an extremely close nexus between the job and the tort. And here it seems like Mr. Rico was acting contrary to the Department of State policy. I mean, isn't that significant to note that? And so I guess I'm just trying to figure out how was the assault foreseeable under Lisa M.? Well, in Lisa M., remember, the court specifically distinguished Mary M. because the ultrasound technician in Lisa M. did not have the power and authority of a police officer. And they held that this case is different than law enforcement cases. But with respect to the government's argument that Agent Rico was not permitted to go and have this interview of Ms. Fajardo, I don't – the government, frankly, overstates the evidence. So let's assume he was. Let's assume he was permitted to go to the place to interview her, that he disregarded policy and going by himself. What do you do with Z.V.? Well. He is a social worker who goes to the home of a minor where he's entitled to go and assaults the minor. Well. I'm sorry. In the course – you know, I mean, and the California Court of Appeal, not the Supreme Court, says it's not in the course and scope of his employment. How is that different than your client? Well, there are a couple of ways. For one, the social worker in Z.V. really came up with a pretext in order to get the minor to meet with him. And that's completely different than what happened here. Well, but he was entitled under the law to go meet with the minor. He could meet with the minor for any reason he wanted to. He was a social worker. He was allowed to, but his purpose in doing it was purely pretextual, where Agent Rico met with Ms. Fajardo because Ms. Fajardo claimed that she had information about this case. So that's one way that sets it apart. Well, but he went there, the record seems to indicate, with the intent not of obtaining information about the case, but in – I mean, again, we have to take these facts – it hasn't been a trial to take these facts, it's true, with the intention of engaging in something improper. Well, I don't – you know, again, I think the government overstates the evidence in that regard. And the district court didn't really make factual findings here in your review in this case, DeNovo, so I think you're free to look at all of the evidence. We don't have to accept all of the plaintiff's allegations as true here. We can look at the record. So what evidence is there that he went to Ms. Fajardo's home to perform an official function? We know she called him. Sure. So tell me what other evidence there is that he went there to perform an official function. Well, she called him, and then after he received the call, he organized the time to meet with her. He put into the – he took out a government vehicle. He wrote on the log the case number that he was going to Chula Vista to visit him. All of this connects his investigation or his – to his visit with Ms. Fajardo. And then when he gets there, she apparently secretly records this conversation. And the transcript shows that they did talk about the investigation. There is – she asks Agent Rico whether the case is his, and he says, no, it belongs to Rick, the white guy. And three different times he says, weren't you going to show me something? And, yes, he also says, before you tell me, put on the high heels. But he comes back to it. And he also, before he went, sent text messages along the same lines. And the text messages are incomplete. But, yes, I mean, we – I think the record is clear that there was more to it than what we've seen. But the fact of the matter is when he gets there, after being told that she has information, he says, weren't you going to show me something? And, yes, she goes and she changes the subject each time. She deflects or she talks about her immigration case. And the government says, well, that shows that he was really there just talking about the immigration case, not the passport case. But that ignores the fact that he came because of the question. When he shows up and says, weren't you going to show me something, obviously he's talking about the passport case. And, in fact, the police report, when Ms. Fajardo went to the police, they hadn't spoken to Agent Rico, but they looked at the transcript, they talked to her, and they put in the police report on page 87 that they were talking about the passport case. The fact that he did that, though, going there alone, contrary to the policy of the Department of State, that he shouldn't travel alone to do an investigation, does that not kick that out of – you know, distinguish this case from Lew? No, for a couple of reasons. One is that – I mean, you have to remember that in Lew, Powell's employer, the government, then prosecuted him. I mean, he wasn't obeying his employer's rules when he was, you know, soliciting bribes and sexually harassing someone. But with respect to the idea that Mr. Rico was not allowed to go have this interview alone, I don't think the record supports that. The government points to two declarations. They point to the declaration of Agent Gordon, who is the one to whom the case was assigned. And Agent Gordon says that he was surprised when he learned that Agent Rico went alone. That's it. He was surprised. Then they point to the declaration of the supervisor, and the supervisor says that when agents are assigned to that office, they receive training that says they should do interviews in tandem. That's it. There's no policy. There's no general order. This is a police department, essentially. This is a federal law enforcement agency. None of the things that you would expect to see governing how they conduct interviews is included there. So let me really posit a slightly different set of facts to help me work this through. Let's assume that Ms. Vajardo calls Mr. Rico, and she says, I have information for you. And he says, this will be a great opportunity for me to engage in something improper because I really like her. She's attractive. And he does all the documentation as if he were going to get the information, but he goes there with the sole intent to do the improper act. Is that – I know that's not your contention of the facts of this case. Would he be then in the course and scope of his employment? I think the court would have to hold an evidentiary hearing and determine whether or not it was. No, those are the facts. That's all the evidence. That's all the evidence. I think he would be. If she calls him and he says, this would be a good opportunity to commit a sexual assault. If that was in the record. I'll cover my tracks by making it seem like I'm going to interview, but I have no intention of doing anything else. That's in the course and scope of the employment. No, that would fall into the pretext cases that the government cites. And if you offer an official pretext for going to meet with someone, then no. Then that does not bring the case within the scope of employment. Okay, so why isn't that – now my question is, why isn't that essentially what this case is? Because there is no pretext. Because Agent Rico didn't make up some reason to go visit Ms. Fajardo. No, it's hypothetical. I asked you, someone called and said, please come and investigate something. So he had a pretext offered by someone else. And he went there not with the intention of investigating, but with the intention of personal business. So assume that he got the call, but didn't go there to investigate. He went there to do the things that he did. Would that be in the course and scope of your employment? No, because if he's not actually going there to conduct an investigation, then his claim that that's why he was going there is pretextual. Okay, so then what do you do with the government's contention that he admitted during the interviews that he wasn't going there to do the investigation, but rather for personal purposes? Well, again, I don't think the record supports that. What they cite in order to show that is a declaration from a department investigator who talked with Agent Rico after the fact. After the Chula Vista Police Department decided there wasn't evidence to investigate, the agency conducted its own investigation. And as a result of that, they haven't disciplined Agent Rico. He's working full-time, and he still works there. This was five years ago. But the investigator put together a report, and he said, I think it's on page 75 or 77 of the record, that Agent Rico initially said that he had gone to Ms. Fajardo's home for official purposes, but then upon further questioning, he admitted that that wasn't really true. And, you know, I think there are a whole lot of different ways to interpret that when you're sitting in on one of these interviews, and the investigator is asking you over and over again, well, that's not really true, is it? And, you know, they put in their report the answer that they get. But Rico also submitted a statement to that investigator at the same time, a handwritten statement that's in the record, and that doesn't include any sort of admission like that. I'm just curious. Is your position that Rico is a law enforcement officer or a police officer? Yeah, he's a federal law enforcement agent, and he's armed to the teeth. And the police officer case law applies to him? Absolutely. And all of the cases the government cite, the problem, I think the big problem with the government's case is that they don't cite any cases that involve analogous employment. But here, I mean, it seems like those police officer cases seem to go with search and seizure, and as far as I can tell here, Mr. Rico was not authorized to search or seize Ms. Verhardo. So I guess what's your best evidence or case showing that he was authorized to perform the functions in light of the case law in Mary M.? Sure. So as I already mentioned a little bit, I don't think that the declarations the government cites to show that Agent Rico didn't have authority to conduct that investigation are strong enough. But beyond that, what we have is an Agent Gordon's declaration. He explains that when he brought Agent Rico with him to conduct the initial investigation, Agent Rico gave Ms. Verhardo his business card with his office number on it and said, please call Agent Rico if you think of anything else about this case. And that's exactly what happened. He authorized Agent Rico to receive more information. And you have to remember also the sequence of events here. On November 3rd, they were told by ICE that she might be deported within a week. Four days later, on November 7th, Agent Rico gets this message on a Friday, and Agent Gordon isn't around. If they wait until next week, she might be gone. None of this is addressed in any of the declarations that the government cites saying he had no authority to have this interview. But then, I mean, if we look at Mary M., then we have to confront this whole public-private issue because it seems like Lew tells us we can't apply Mary M. because the FTCA's sovereign immunity waiver is limited to circumstances where the United States would be liable as a private person. So I guess it's your best argument how we can apply Mary M. here. Well, with respect to Lew's discussion of it, Lew was considering whether or not the government was responsible under the FTCA. They weren't deciding whether or not the Westfall Act applies. But have you ever raised this issue before? No. So how have you waived it? Well, we've argued throughout that the public-private dichotomy wasn't effective for other reasons. I understand, but there's no citation to the Westfall Act. We have a certified question in front of us. And do you have any cases that say we look to the Westfall Act in this circumstance? Do you have any cases? I mean, the Westfall Act cases that we cite all say that because the statute just says, you know, you apply the law of the place where it occurred, and that's how they leave it. And there are no cases that we've been able to find and we've looked that apply the Westfall Act and private employment law. But we have a certified question from the district court. Yes. The question before the district court was simply whether under California law, not the Westfall Act argument, but whether under California law he was acting in the scope of his employment. Can we expand that question to consider new arguments that you've never raised to the district court? I don't think it's expanding the argument. I'm asking you to apply California law. And when the government says that you have to ignore these certain cases, what I'm saying is that that's not true. I see that my time has run out. Thank you. Thank you. I'll give you one minute. Thank you, Your Honor. Just a very quick point on the Westfall Act FTCA distinction. There really is no distinction. It's an either-or proposition here, whether the United States is liable or whether the agent's liable under the Westfall Act. I think the case there is 546 U.S. 43 United States v. Olson. I think the Supreme Court applied Kentucky law under the Westfall Act. I think that's correct. But, again, hopefully I am. A few minor record kind of quibbles that we have. Page 67, paragraph 4, the last sentence. Melissa Main, the State Department's head of the San Diego office, says agents are never authorized to conduct interviews alone. That's full stop. That is the Bureau of Diplomatic Security's policy. On page 68, she says that Agent Gordon was in charge of this investigation. Agent Rico had no role in this investigation without Gordon's approval. And that, I think, underscores the fundamental distinction between our position and the position of Rico's counsel, which is this is not even Rico's investigation. This is nothing like Lew, where Lew is, where Powell is the asylum officer in charge of the entirety of the investigation and actually goes about the asylum business in a very perverse way. This isn't part of what. But that's not quite true. He was at the investigation with Ms. Fajardo previous to that. So he may not be the lead on the investigation. He's not a stranger to the investigation. Right. There were many. There were several. There were at least two people who were kind of like the second. This all arises because she meets him when he's there during the investigation. And Lisa M. makes clear that the fact that time and place brought two individuals together doesn't make them within the scope of employment. And I just want to address one last record point as my time, I realize I'm going over, which is the idea that he couldn't have contacted Agent Gordon because Agent Gordon wasn't around. If you look at the record, Rico texts Fajardo about wearing heels, garter belts, et cetera, for over six hours without attempting to contact anybody within the San Diego office. This really isn't a case where Rico, because of some sense of urgency, had to assign himself a greater role in the investigation. I know I've gone over, but let's assume for a moment that there's conflicting versions of the facts. What do we do in the context of this case? I don't think there really are significantly conflicting versions of the facts. The district court at least said that the facts are undisputed. In the context of this case, Westville Act determinations are made on a preponderance of the evidence standard, and this court is reviewing de novo. And so, you know, this might be an entirely different case if Rico actually had evidence that he at any point asked about the passport fraud investigation. Instead, if you look on, like, page 119 where he says, can you show me something, the next sentence that Fajardo states, or at least two downs, says, oh, right, I can put them on, meaning my heels. I don't think that is a passport fraud investigation at all. I think what he's asking about there is something more akin to a sexual purpose. But, I mean, there were references to the investigation while this other additional conversation is going on. So it seems like they're intertwined. There are references, but only in the context of she begins to talk about her deportation proceedings, and Agent Rico, the only time he actually mentions the word passport is to say, I'm not part about your deportation proceedings. I only do passports. And the passport investigation belongs to Gordon, which is what he calls the white guy. Yeah, but the whole premise was that she said she had information regarding that. So, I mean, it seems like they were all intertwined. And I know you're trying to pick the parts of the conversation, but there's other parts that seem to reference and spill over into the whole reason, you know, of the investigation. But anyhow. And maybe this is the answer to your question, which is sort of is the pretext line of cases. So ZV is a pretext case about building rapport. There is some tiny sliver of an employment responsibility. I'm not sure they're mutually exclusive here. But thank you very much. I appreciate your oral argument presentation. Both of you, for your excellent oral arguments here today, the case of Fajardo and Rico versus the United States of America is now submitted.
judges: Murguia, Hurwitz, Guirola